IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| LA'TOSHA BAXTER, o/b/o L.D., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 2:05cv424-MHT |
| | ) | (WO) |
| JO ANNE BARNHART, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**RECOMMENDATION OF THE MAGISTRATE JUDGE**

The *pro se* plaintiff, La'tosha Baxter, filed this lawsuit on behalf of her daughter, L.D.[1], to review a final judgment by Defendant Jo Anne Barnhart, Commissioner of Social Security, in which she determined that L.D. is not "disabled" and therefore, not entitled to supplemental security income benefits. Her application was denied at the initial administrative level. The plaintiff then requested and received a hearing before an Administrative Law Judge ("ALJ"). Following the hearing, the ALJ also denied the claim. The Appeals Council rejected a subsequent request for review. The ALJ's decision consequently became the final decision of the Commissioner of Social Security (Commissioner).[2] *See Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986). The court has

---

[1] Pursuant to the E-Government Act of 2002, as amended on August 2, 2002, and M.D. Ala. General Order No. 2:04mc3228, the court has redacted the plaintiff's minor child's name throughout this opinion and refers to her only by her initials, L.D.

[2] Pursuant to the Social Security Independence and Program Improvements Act of 1994, Pub.L. No. 103-296, 108 Stat. 1464, the functions of the Secretary of Health and Human Services with respect to Social Security matters were transferred to the Commisoner of Social Security.

jurisdiction over this lawsuit under 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons that follow, the court concludes that the Commissioner's decision denying L.D. supplemental security income benefits should be reversed and remanded for further proceedings.

## I. STANDARD OF REVIEW

In 1996, the President signed into law the Personal Responsibility and Work Opportunity Reconciliation Act of 1996, which included a new standard for defining child disability under the Social Security Act. *See* PUB. L. NO. 104-193, 110 Stat. 2105, 2188 (1996). The revised statute provides that an individual under 18 shall be considered disabled "if that individual has a medically determinable physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(I) (1999). The sequential analysis for determining whether a child claimant is disabled is as follows:

1. If the claimant is engaged in substantial gainful activity, he is not disabled.
2. If the claimant is not engaged in substantial gainful activity, the Commissioner determines whether the claimant has a physical or mental impairment which, whether individually or in combination with one or more other impairments, is a severe impairment. If the claimant's impairment is not severe, he is not disabled.
3. If the impairment is severe, the Commissioner determines whether the impairment meets the durational requirement and meets, medically equals, or functionally equals in severity an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment satisfies this requirement, the claimant is presumed disabled.

*See* 20 C.F.R. § 416.924(a)-(d) (1997).

The Commissioner's regulations provide that if a child's impairment or impairments does not meet, or is not medically equal or functionally equivalent in severity to a listed impairment, the child is not disabled. *See* 20 C.F.R. § 416.924(d) (2003). In reviewing the Commissioner's decision, the court asks only whether her findings concerning the steps are supported by substantial evidence. *See Brown v. Callahan*, 120 F.3d 1133 (10th Cir. 1997).

## II. PLAINTIFF'S CLAIMS

The plaintiff, proceeding *pro se*, argues that L.D.'s impairments "cause[] her to not function as a normal child her age." (Pl's Statement of the Issues at 1). Specially, the plaintiff asserts that all of L.D.'s impairments have lasted for more than twelve months; her migraine headaches and seizures have worsened in intensity and increased in frequency; and her medication dosages have increased and are not controlling her headaches or seizures. In addition, the plaintiff asserts that L.D.'s treating physician has changed her medications from Topamax to Depakote and Mazalt because the Topamax was not adequately controlling her headaches and seizures.

The plaintiff raises several issues and arguments related to this court's ultimate inquiry of whether the Commissioner's disability decision is supported by the proper legal standards and by substantial evidence. *See Bridges v. Bowen*, 815 F.2d 622 (11th Cir. 1987). However, the court pretermits discussion of the plaintiff's specific arguments because the court concludes that the ALJ erred as a matter of law, and thus, this case is due to be remanded for further proceedings.

### III.  DISCUSSION

#### A. Procedural History

The ALJ, in his opinion, followed the regulations' three steps as listed above when he analyzed L.D.'s claim.  After doing so, he concluded that L.D. is not disabled and, therefore denied her claim for supplemental security income benefits.  Under the first step, the ALJ found that L.D. is not engaged in substantial gainful activity.  At the second step, the ALJ found that L.D. has severe impairments of attention deficit hyperactivity disorder (ADHD), complex partial seizures, and headaches.  (R. 16).  The ALJ also noted that although L.D. has been diagnosed with Post Traumatic Stress Disorder ("PTSD") and mood disorder, not otherwise specified, he concluded that these conditions  "did not exist for a sufficient time for an appropriate longitudinal evaluation to be performed."  (*Id*. at 17).

Next, at step three, the ALJ found that L.D. did not have an impairment, individually or in combination, that meets or medically equals any of the impairments listed in Appendix 1 of 20 C.F.R. Part 404, Subpart P.  In so finding, the ALJ referenced Listing 112.04, Mood Disorders and Listing 112.11, Attention Deficit Hyperactivity Disorder (R. 17), but concluded that L.D.'s "impairments do not result in "marked and severe" functional limitations. (R. 21).  Consequently, the ALJ concluded that L.D. is not disabled.

#### B.  Medical History

A brief discussion of L.D.'s treatment history is in order.  In August 2002, L.D. was seen by her primary care physician, Dr. Rama Sarathy, after revealing to her mother that, for

three years, she had been sexually abused by her uncle and her brother. (R. 151). Dr. Sarathy confirmed, by examination, that L.D. was the victim of sexual abuse. L.D. was referred to Grandview Behavioral Health Clinic for counseling and a psycho-social evaluation. (R. 164-183). After an assessment, Dr. Mejer diagnosed L.D. as suffering from PTSD as a result of being a child victim of sexual abuse. (R. 170). When therapy did not alleviate her behavioral problems, Dr. Mejer prescribed Prozac, a psychotropic medication, to help treat her PTSD. (R. 168). On November 22, 2002, L.D. was diagnosed with Attention Deficit Hyperactivity Disorder ("ADHD") and was prescribed Adderall. (R. 183).

Also in November 2002, Monica Cone, a licensed professional counselor, described L.D. as follows:

> L.D. has received a forensic interview at the Montgomery Children's Advocacy Center, and it has been determined that she was sexually victimized by 2 relatives for a period of four years. She is involved in both individual and group therapy here.
>
> L.D. . . . has suffered psychological, emotional, and social trauma due to this devastating experience. She meets the criteria for V61.21 (995.5) (sexual abuse of a child) in the Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition.
>
> L.D. meets the criteria also for Post Traumatic Stress Disorder in the DSM-IV. Evidences of this diagnosis are the child's nightmares, sleep problems, excessive anger, diminished social relationships. She physically attacked another child here at the agency right before group therapy.
>
> L.D. struggles with much guilt, shame and feelings of responsibility for her loved ones being put out of the home. She has lost her "youthfulness" and since (sic) of childhood wonder. In therapy, I am attempting to help her regain a sense of being a child again.

>L.D.'s entire life has been and will always be impacted by the crimes committed against her. . . .

(R. 184).

On December 12, 2002, Dr. Patricia Hinson, Ph.D., a non-examining consultant for the Commissioner, opined that L.D. has impairments of PSTD and ADHD, possibly combined type ADHD. (R. 186).

In March 2003, L.D. was referred to Dr. Jean-Ronel Corbier, a pediatric neurologist, for evaluation of staring episodes and behavioral problems. (R. 247-249). Dr. Corbier noted that L.D. was previously diagnosed with PTSD and ADHD. (R. 200-202). He opined that her staring episodes and headaches were indicative of complex partial seizures. (R. 201). A March 6, 2003, EEG was "mildly abnormal" and indicated "[r]are sharp epileptiform discharges" in the F3/F4 and F7/F8 bisynchronously. (R. 199). "Localized sharp wave activity was occasionally noted in the right and left frontal areas." (R. 199). As a result of the EEG, Dr. Corbier prescribed Topamax to treat L.D.'s seizures. (R. 200-202).

In March 2003, Drs. Mejer and Sarathy both referred L.D. to Associated Psychologists for treatment because she was displaying behavioral and emotional symptoms. (R. 214, 224). On May 2, and May 7, 2003, L.D. underwent an evaluation and assessment. (R. 214). At that time, she was taking Prozac for her PTSD, Adderall for her ADHD, and Topamax for her seizures. (R. 215). Dr. Marnie Dillon, a licensed clinical psychologist, "strongly suggested that L.D. participate in counseling to address abuse history. . . . [and she] [c]ontinue administration of current psychostimulant medication." (R. 219). L.D. continued

counseling with Dr. Dillon.[3] (R. 223).

Dr. Corbier saw L.D. on June 9, 2003 for a follow-up for her seizures and migraine headaches. (R. 197, 244). At that time, Dr. Corbier noted that "[w]hile her symptoms have improved, they are not fully controlled." (*Id.*)

On July 21, 2003, Dr. Dillon observed that L.D. was suffering from depression; her mood was related to family and relationship issues. (R. 224). On August 21, 2003, L.D. reported no "emotional conflict" regarding past sexual abuse "in recent weeks." (*Id.*) However, in November 2003, L.D.'s grades had fallen to four D's and her behavior at school was unstable. (R. 223). Her Stratera[4] medication was causing her to sleep in class. She was also talking excessively and was disorganized and distracted. (*Id.*). Her November 4, 2003, progress report confirmed a problem with excessive talking in class. (R. 130).

Dr. Corbier also saw L.D. in November 2003. (R. 242). At that time, L.D.'s seizures were "well controlled but she is having breakthrough headaches. . . [and] problems with her ADHD symptoms." (*Id.*). Although a November 17, 2003, EEG was normal, Dr. Corbier noted that L.D. was experiencing breakthrough headaches and problems with ADHD. (R. 194-195, 241, 243). L.D. was taking Stratera, 40 mg. per day. Her Topamax was increased from 25 mg. twice per day to 25 mg. in the morning and 50 mg. in the evening. (R. 195-

---

[3] L.D. saw Dr. Dillon on May 11, June 16, July 21, August 21, and November 10, 2003. She also saw Dr. Dillon on March 3 and April 1, 2004. (R. 223-224).

[4] At some point in 2003, L.D.'s ADHD medication was switched from Adderall to Stratera. She has since been prescribed Adderall at a higher dosage. (R. 195-196).

7

196). In addition, Dr. Corbier suggested switching L.D.'s medication back to Adderall and increasing her dosage from 10 mg to 15 mg. (R. 196).

On December 19, 2003, L.D. underwent a consultative examination by Dr. Daniel Clark, Ph.D., of Associated Psychologists.[5] Dr. Clark opined that L.D. was suffering from ADHD, Combined type, Mood Disorder, NOS, and Borderline Intellectual Functioning. (R. 210). Dr. Clark noted that L.D. experienced migraine headaches and was diagnosed with epilepsy. Although Dr. Clark noted that L.D. was previously diagnosed with PTSD, currently under the care of his partner, and prescribed Prozac, his diagnostic impressions did not include PTSD.

> L.D. was reportedly sexually abused by her uncle and brother from the ages of 7 to 10. She disclosed this abuse in August 2002. Currently, L.D. denies significant symptoms of Post Traumatic Stress Disorder, although symptomatology was present immediately following the abuse. It is significant to note that L.D. has consistent contact with these individuals as [her mother] states "I don't want her to feel that they had to leave because of her. Even now if she doesn't see them for a while she'll as (sic) about them. But I told her to tell me if anything ever happens again." However, [her mother] reports an increase in defiant behavior with fluctuations in mood. Within the past six months [her mother] states that L.D. has exhibited a decrease in appetite, decrease in sleep, "bosses" her siblings, will not listen to instruction, is irritable, argues with adults and peers, and destroys toys and objects in the home during tantrums. L.D. does meet significant criteria for Mood disorder, NOS as her elevated level of irritability is primarily observed in the home with minimal problems at school.

(R. 211).

In January 2004, Dr. Corbier noted that L.D. was still suffering from epilepsy,

---

[5] Dr. Clark is Dr. Dillon's partner at Associated Psychologists. (R. 210).

migraine headaches and ADHD, although the ADHD was improving. (R. 239). Dr. Corbier again expressed concern that L.D. was experiencing breakthrough seizures. (R. 239-240).

During counseling on March 3, 2004, L.D. described isolated nightmares about her past sexual abuse. (R. 223).

In June 2004, Dr. Corbier reported that L.D. was diagnosed with seizures as well as headaches and ADHD and that she was being treated with Topamax and Stratera. (R. 234). On June 8, 2004, Dr. Corbier noted that L.D. was having daily headaches and possible breakthrough seizures. (R. 237). Although a June 10, 2004, letter from Dr. Corbier to L.D.'s mother indicated that L.D.'s most recent EEG was normal, (R. 235), the results of the EEG clearly contradict that conclusion.

> Mild-to-moderately frequent sharp discharges were noted in F3/F4 with some secondary generalization. . . . **This EEG is Abnormal**. Localized sharp wave activity was noted in the right and left frontal central areas. Secondary generalization was also present.

(R. 236) (emphasis added).

On December 28, 2004, Dr. Corbier wrote the following letter on L.D.'s behalf.

> I have been requested by Mrs. Baxter (mother of L.D.) to write this letter as the patient's child neurologist, to give you an up-to-date assessment of the patient's clinical condition. She has been diagnosed with epilepsy, migraine headaches, ADHD and sleep disturbance. Her seizures have been documented by 2 EEGs in addition to a recent 24 hour ambulatory video EEG. She is currently being treated for the seizures with Topamax. She specifically has complex partial seizures. She also has severe headaches that occur 4 - 5 times per week for which the Topamax, which is also a migraine prophylactic medication, is being used.

(R. 250).

9

### C. Administrative Hearing Testimony

On June 2, 2004, the plaintiff represented herself and her daughter at the hearing before the Administrative Law Judge ("ALJ"). At the administrative hearing, the plaintiff testified that L.D. was disabled due to epilepsy, seizures, migraines, staring spells and headaches. (R. 28, 33). She further testified that the medications were helping L.D.'s seizures as they "were not as severe as they were at first." (R. 29). The plaintiff testified that L.D. sees Dr. Dillon at Psychiatric Associates every month and that Dr. Dillon "was going to re-evaluate her" in either August or September. (R. 36-37).

Dr. Doug McKeown testified as a medical expert. He opined that while L.D. "has a history of an assortment of difficulties," she did not meet Listing 112.11, ADHD. He also opined that her depression did not meet Listing 112.04, Affective Disorders.[6] Although he indicated that L.D. might have some 112.05 considerations, he did not state what those considerations might be.[7] Dr. McKeown offered no opinion about whether L.D. met, medically equaled, or functionally equaled in severity Listing 111.02, Major motor seizure disorder, or Listing 111.03, Nonconvulsive epilepsy. Dr. McKeown opined that her "ADHD symptomatology appears to be, you know, under some degree of control" and her "depression is not considered, based on the record, very significant." (R. 40).

After the medical expert testified, the ALJ asked the plaintiff if she had any questions

---

[6] Listing 112.04 is entitled Mood Disorders.

[7] Listing 112.05 is the listing for Mental Retardation.

10

for Dr. McKeown. (R. 39). The plaintiff bluntly stated "I don't understand what all that means. I mean, I don't understand what you are saying." (*Id*.) The medical expert offered the plaintiff some explanation and then the ALJ asked the plaintiff if she had anything further to present. (R. 39-40)

> WTN: Okay, and I don't know. They should have in her records, but she goes to see like three – four different doctors. And everything should be Dr. Dillon, a psychologist, a psychiatrist. I don't know which one she is, but it's – you know, she suggested to get the change from Adderall to Stratera, and it has helped. . . . But you know, I don't know exactly what to do with her because I don't want her to think that I'm like giving up on her or anything like that, but I don't understand the different things I should do. . . . So she sees Dr. Dillon, Dr. Corvia[8] for the seizures, and her normal physician, like, you know, every other month. But she sees Dr. Dillon every month, and Dr. Corvia every month.

(R. 40-41).

## D. Analysis

An ALJ has a duty to fully and fairly develop the record. *See e.g. Lucas v. Sullivan*, 918 F.2d 1567 (11th Cir. 1990). *See also, Kelley v. Heckler*, 761 F.2d 1538 (11th Cir. 1985). When a claimant is unrepresented by counsel at the administrative hearing, the ALJ has a heightened duty to develop a full and fair record.[9] *See e.g., Smith v. Schweiker,* 677 F.2d 826, 829 (11th Cir. 1982). Notwithstanding a valid waiver of the right to representation at

---

[8] It is clear that the plaintiff is referring to Dr. Corbier.

[9] It is undisputed that the plaintiff waived her right to representation at the administrative hearing. The right to a representative is a statutory right, 42 U.S.C. § 406, which may be waived. *Smith v. Schweiker,* 677 F.2d 826 (11th Cir. 1982).

the hearing, when a disability claimant is unrepresented by an attorney, the duty of an ALJ to develop a full and fair record rises to a special level. *Id.* The ALJ must conscientiously probe into, inquire of and explore all relevant facts to elicit both favorable and unfavorable facts for review. *Cowart v. Schweiker,* 662 F.2d 731, 735-36 (11th Cir. 1981). A remand to the Commissioner is warranted when the plaintiff shows prejudice. *Kelley v. Heckler,* 761 F.2d 1538 (11th Cir. 1985).

> This at least requires a showing that the ALJ did not have all of the relevant evidence before him in the record (which would include relevant testimony from claimant), or that the ALJ did not consider all of the evidence in the record in reaching his decision. *See Smith* [*v. Schweiker,* 677 F.2d 826, 830 (11th Cir. 1982)] (relevant inquiry is whether the record reveals evidentiary gaps which result in unfairness or clear prejudice).

*Id.* at 1540.

The court has reviewed the record and concludes that the ALJ erred as a matter of law he failed to develop the record and adequately consider whether L.D. meets, medically equals or functionally equals in severity Listing 111.02, Major motor seizure disorder, or Listing 111.03, Nonconvulsive epilepsy. The court further concludes that the plaintiff was prejudiced by the ALJ's failure to adequately and fully develop the record regarding L.D.'s PTSD, mood disorder and/or depression.

  **1.**  **Listings regarding Seizures and/or Epilepsy**. Epilepsy is a "disease characterized by on or more of the following symptoms: paroxysmally recurring impairment or loss of consciousness, involuntary excess or cessation of muscle movements, psychic or sensory disturbances, and perturbation of the autonomic nervous system." *Dorland's*

*Illustrated Medical Dictionary* 501 (24th ed. 1965).  The Commissioner's Listings provide, in pertinent part, that a child is disabled due to epilepsy if she meets the following criteria:

> 11.02 *Major motor seizure disorder.*
>
>   *A. Convulsive epilepsy.*  In a child with an established diagnosis of epilepsy, the occurrence of more than one major motor seizure per month despite at least three months of prescribed treatment.  With:
>   1.  Daytime episodes (loss of consciousness and convulsive seizures) or
>   2.  Nocturnal episodes manifesting residuals which interfere significantly with activity during the day. . . .
>
> 11.03 *Nonconvulsive epilepsy.*  In a child with an established diagnosis of seizure disorder, the occurrence of more than one minor motor seizure per week, with alteration of awareness or loss of consciousness, despite at least three months of prescribed treatment.

20 C.F.R. Pt. 404, Subpt. P, App. 1.

    The record clearly demonstrates that L.D. has been diagnosed and treated for epilepsy and complex partial seizures.  It is well-documented that, although L.D.'s seizures have responded to medication, she continues to experience breakthrough seizures and headaches. (R. 237, 239-240, 242).  Dr. Corbier noted that "[w]hile her symptoms have improved, they are not fully controlled."  (R. 244).  As recently as December 28, 2004, Dr. Corbier reported that L.D.'s epilepsy and complex partial seizures were documented by 2 abnormal EEG's and a " recent 24 hour ambulatory video EEG."  (R. 250).

    The ALJ highlighted one notation from Dr. Corbier's treatment notes when he discussed L.D.'s partial complex seizures.  "On November 13, 2003, L.D.'s "**seizures were**

13

**well controlled**." (R. 16) (emphasis in original).  However, the ALJ excluded the rest of Dr. Corbier's note "but she is having breakthrough headaches." (R. 242).  In addition, the ALJ ignored the remainder of Dr. Corbier's treatment notes in which he indicates that L.D. is experiencing breakthrough seizures as well as headaches.(R. 237, 239-240).  Finally, the ALJ ignores L.D.'s most recent EEG from June 9, 2004, which was abnormal.  (R. 236).  Although the medical evidence clearly demonstrates that L.D.'s seizures and epilepsy are not completely controlled by her treatment, the ALJ did not inquire further about the efficacy of her treatment.[10]  Without developing the record more fully regarding the plaintiff's epilepsy, the ALJ could not make an informed decision based on the record before him, and thus, his decision is not supported by substantial evidence.

Furthermore, there is sufficient evidence in the record for the ALJ to either consider whether L.D. meets, medically equals, or functionally equals in severity Listings 111.02 or 111.03.  Notwithstanding the medical evidence, neither the ALJ nor the medical expert

---

[10]  An ALJ may not arbitrarily pick and choose facts from the medical evidence to support his conclusion without articulating specific, well supported reasons for crediting some evidence while discrediting other evidence. *Marbury v. Sullivan*, 957 F.2d 837, 839, 840-841 (11th Cir. 1992).  When there is a conflict, inconsistency or ambiguity in the record, the ALJ has an obligation to resolve the conflict, giving specific reasons supported by the evidence as to why he accepted or rejected one opinion over another.  "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart,* 662 F.2d at 735.  "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson,* 755 F.2d at 785.  It appears that the ALJ simply ignored comments or medical evidence that did not support his conclusions regarding L.D.'s seizures.  This he cannot do.

"[I]t is the responsibility of the Secretary and not the courts to reconcile inconsistencies in the medical evidence, and that it is the claimant who bears the risk of nonpersuasion." *Seacrist v. Weinberger*, 538 F.2d 1054, 1056- 57 (4th Cir. 1976). *See also, Gastineau v. Mathews*, 577 F.2d 356, 358 (6th Cir. 1978) ("It is not the function of this Court to resolve conflicts in the medical evidence, but rather it is the function of the Secretary, whose expertise is given great deference.")

considered whether L.D. meets, medically equals, or functionally equals in severity the Listings for seizures or epilepsy. At a minimum, the ALJ should have more fully developed the record regarding the extent of L.D.'s breakthrough seizures before rendering a decision regarding her seizures and/or epilepsy.

  **2.**  **PTSD and/or mood disorder.**  In addition, the court concludes that the ALJ did not properly consider whether L.D.'s PTSD or mood disorder rise to the level of severe impairments. The ALJ did not find that L.D.'s PTSD or mood disorder were severe impairments because they "did not exist for a sufficient time for an appropriate longitudinal evaluation to be performed." (R. 17). The ALJ was simply wrong. L.D. was initially diagnosed with PTSD in August 2002. (R. 170). On November 25, 2002, counselor Monica Cone opined that L.D. met the diagnostic criteria for PTSD. (R. 184). In December 2002, the Commissioner's own consultant opined that L.D. had an impairment of PTSD. (R. 186). In May 2003, L.D. was receiving Prozac for her PTSD. (R. 215). Further counseling and continued medications were recommended. (R. 219). In December 2003, Dr. Clark noted that L.D. was still prescribed Prozac for her PTSD even though his diagnostic impression did not include PTSD. (R. 210). From April 23, 2003, until at least April 1, 2004, L.D. was receiving counseling from Dr. Dillon related to her PTSD and past sexual abuse. (R. 223-224). At the June 2004 administrative hearing, L.D.'s mother testified that L.D. was continuing to see Dr. Dillon every month and that Dr. Dillon was going to re-evaluate her in August or September 2004. (R. 40-41).

There are ample references in the record to put the ALJ on notice that, as late as June 2004, L.D. was being treated by a clinical psychologist for mental impairments. She has been in psychological counseling from 2002 until at least 2004. She was prescribed psychotropic medication for PTSD in October 2002. In December 2003, she was still taking Prozac for her PTSD. (R. 211). The medical evidence sufficiently establishes that L.D.'s mental impairments have lasted for a period of twelve continuous months. Consequently, the ALJ's determination that L.D.'s PTSD and/or mood disorder were severe impairments because they "did not exist for a sufficient time for an appropriate longitudinal evaluation to be performed," (R. 17), is not supported by substantial evidence. Therefore, this case must be remanded for further consideration of whether L.D.'s PTSD and/or mood disorder constitute severe impairments.[11]

## IV. CONCLUSION

Accordingly, it is the RECOMMENDATION of the Magistrate Judge that this case be reversed and remanded to the Commissioner for further proceedings. It is further

---

[11] Even if the ALJ properly evaluated L.D.'s PTSD and mood disorder and concluded that they were not severe impairments, the ALJ was still under an obligation to consider all of L.D.'s impairments and determine whether the alleged impairments are sufficiently severe - either singularly or in combination - to create a disability. *See Gibson v. Heckler,* 779 F.2d 619, 623 (11th Cir. 1986). All of the plaintiff's impairments must be considered in combination, even when the impairments considered separately are not severe. *Hudson v. Heckler,* 755 F.2d 781, 785 (11th Cir. 1985), *aff'd*, 490 U.S. 877 (1989). In addition, the ALJ must state, with sufficient specificity, the reasons for his decision referencing the plaintiff's impairments. "In the absence of such a statement, it is impossible for a reviewing court to determine whether the ultimate decision on the merits is rational and supported by substantial evidence." *Cowart v. Schweiker,* 662 F.2d 731, 735 (11th Cir. 1981). "Failure to do so requires the case be vacated and remanded for the proper consideration." *Hudson,* 755 F.2d at 785.

In this case, it is clear that the ALJ failed to meet his burden with respect to evaluating all the evidence of L.D.'s impairments in combination.

ORDERED that the parties shall file any objections to the said Recommendation on or before **August 21, 2006.**  Any objections filed must specifically identify the findings in the Magistrate Judge's Recommendation to which the party objects.  Frivolous, conclusive or general objections will not be considered by the District Court.  The parties are advised that this Recommendation is not a final order of the court and, therefore, it is not appealable.

Failure to file written objections to the proposed findings and recommendations in the Magistrate Judge's report shall bar the party from a de novo determination by the District Court of issues covered in the report and shall bar the party from attacking on appeal factual findings in the report accepted or adopted by the District Court except upon grounds of plain error or manifest injustice.  *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982).  *See Stein v. Reynolds Securities, Inc.*, 667 F.2d 33 (11th Cir. 1982).  *See also Bonner v. City of Prichard*, 661 F.2d 1206 (11th Cir. 1981, *en banc*), adopting as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

Done this 7th day of August, 2006.


                                        /s/Charles S. Coody
                                    CHARLES S. COODY
                                    CHIEF UNITED STATES MAGISTRATE JUDGE